UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | No. 2:06-CR-13 |
| ) | |
| KATHRYN LOIS AYERS ) | |

**REPORT AND RECOMMENDATION**

Defendant is indicted for possessing 50 grams or more of methamphetamine with the intent to distribute. She has filed a motion to suppress evidence seized from her person and her residence on July 1, 2005. (Doc. 19). An evidentiary hearing was held on August 1, 2006.

The genesis of defendant's arrest and subsequent prosecution was a traffic stop that occurred in Johnson City, Tennessee, in the early morning hours of July 1, 2005. Two "crack pipes," cylindrical glass cubes used for smoking crack cocaine and methamphetamine, were seized from defendant's person as a result of a pat-down search, another crack pipe was taken from her residence several hours later, 28 grams of methamphetamine were discovered on defendant's person after she was searched during the booking process, and sometime later 180 grams of methamphetamine were found in a safe in defendant's residence. Defendant alleges that each of these searches was violative of the Fourth Amendment to the Constitution.

At the outset, if the recitations in the plaintiff's supporting brief are true, then her motion to suppress should be granted, at least in large part. Defendant did not testify, as is

her unqualified right, but as a result the court cannot make any determination regarding the accuracy of the facts as she claims them to be, much less her credibility. On the other hand, Drug Task Force Agent Jeff Dean, who was the primary law enforcement agent involved in the stop and subsequent arrest of defendant, did testify, and everything about his testimony - his demeanor, his knowledge of relevant facts, and the logic of the facts he related - indicate that he told the unembellished, unvarnished truth. In short, he was extremely credible. With this as background, the court finds the facts as follows:

As of June 30, 2005, there had been for some time an on-going investigation regarding Kathryn Ayers and her involvement in methamphetamine trafficking. Officer Jeff Dean of the Washington County Sheriff's Department, attached to the First Judicial District Drug Task Force, received a phone call from an informant that defendant had a large quantity of methamphetamine and later would be going to the Nashville Sound (a nightclub) in Johnson City to sell that drug. Agent Dean knew *of* Ms. Ayers, but did not know her by sight. Agent Dean's partner, Agent Commons, also knew of Ms. Ayers, but neither did he know her by sight. However, both agents knew where Ms. Ayers lived and, as a result of the phone call from the informant, they established surveillance on Ms. Ayers' residence. At this point it is appropriate to interject that Agent Dean had never used this informant as a "confidential informant" in the past, so it is presumed that he knew nothing about the informant's trustworthiness and reliability. That, however, has no significance as far as this case is concerned. Suffice it to say, Agents Dean and Commons knew that Kathryn Ayers was suspected of trafficking in methamphetamine, they had received a phone call from an

2

informant that she had a sizable quantity of methamphetamine which she intended to dispose of at the Nashville Sound that night, they knew where Ms. Ayers lived, and they set up surveillance.

Agents Dean and Commons were in an unmarked car. During the course of their surveillance of Ms. Ayers' residence, they observed a female exit that residence and get into a green Camaro vehicle. They began following the Camaro, not because they knew that the driver was Ms. Ayers, but only because they intended to maintain surveillance on *anyone* who left that house. Of course, they strongly suspected the driver was Ms. Ayers, but neither is that of any significance.

The two agents followed the green Camaro for some distance, and "paced" the car, meaning that they maintained a constant distance behind the green Camaro to determine the Camaro's speed. At various times, the Camaro exceeded the posted speed limit by 15 to 20 miles per hour. As the Camaro made a right turn, it swung widely to the left and crossed over to some extent into the oncoming lane of traffic. The agents also observed that the left tail light on the Camaro was broken and inoperable. Thus, the agents personally observed the driver of the Camaro commit a number of moving traffic violations.

The agents elected to effect a traffic stop of the Camaro based on these moving traffic violations. Clearly, the *real* purpose of the traffic stop was to investigate the driver for possible violations of the drug laws. In other words, the traffic stop was pretextual. The fact that the traffic stop was a pretext for the real reason - the investigation of drug trafficking -

does not in any way invalidate the stop, so long as the traffic violations in fact occurred.[1]

Agents Commons and Dean attempted to summons a marked police cruiser to make the traffic stop, but no such vehicle was nearby[2]; accordingly, Agent Commons placed a portable blue light flasher on the dashboard of his unmarked car and, within two blocks, the Camaro came to a stop.

After the stop, Agent Dean walked up to the passenger side of the car and looked into the window; as he did so, he noticed that the driver took something from or near the console and placed that "something" between the two front seats. Agent Commons in the meanwhile walked up to the driver's side, and he was told by Dean that the driver had placed something between the front seats. Because neither officer knew what Ms. Ayers had placed between the car seats, Agent Commons asked the driver to get out of her car and walk to its rear, which she did. Agent Commons told her of the observed traffic violations and asked her for a driver's license. The driver accurately identified herself as Kathryn Ayers, but was unable to produce a driver's license.[3]

---

[1] *See, Whren v. United States*, 517 U.S. 806 (1996); *Arkansas v. Sullivan*, 532 U.S. 769 (2001); *United States v. Bailey*, 302 F.3d 652, 656-57 (6th Cir. 2002); *United States v. Johnson*, 242 F.3d 707, 709-10 (6th Cir, *cert,* den'd 534 U.S. 863 (2001)).

[2] The Drug Task Force Agents undeniably had the authority to make the traffic stop themselves. They preferred to get a marked cruiser simply because some drivers understandably would be concerned that a plainclothes officer driving an unmarked car with a flashing blue light might be an imposter.

[3] A subsequent records' check revealed that Ms. Ayers in fact held a valid driver's license.

4

The agents asked Ms. Ayers for permission to search her car, to which she consented.[4] Within just a few moments of the traffic stop, several marked police cars arrived at the scene, including a K-9 Unit. The search of defendant's car revealed no contraband. In the meantime the dog conducted a "free air" sniff. As best as this magistrate judge can tell, a free air sniff is nothing more than walking the dog around the car. In any event, the dog "alerted" at the outside of the car in several places, and at the driver's seat. Use of a drug dog under these circumstances is not a "search" for purposes of the Fourth Amendment, *see, e.g., United States v. Place*, 462 U.S. 696, 707, but that in reality is an irrelevant inquiry inasmuch defendant admittedly had given her consent to search her vehicle. The "alert" of a trained narcotics dog in and of itself constitutes probable cause to search an item and to arrest whoever possesses that item. *Place, supra*, at 707, *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). However, it should be borne in mind at this juncture that the issue is not whether Agent Dean had probable cause to arrest Ms. Ayers on the basis of the drug sniff; indeed, she was not arrested at that point. Rather, the positive alert by the drug dog created at the very least a reasonable and articulable suspicion that Ms. Ayers was in possession of illegal drugs. Thus, the "traffic stop" had metamorphosed into an investigation regarding drug possession in the sense of *Terry v. Ohio*, 390 U.S. 1 (1963). When a law enforcement officer has "reasonable suspicion" based on articulable facts that criminal activity has occurred or is about to occur, that officer may stop and briefly detain a person for investigative reasons. *Terry*, 392 U.S. at 30. And "it is well established that an officer

---

[4]Defendant so acknowledges in her motion.

Case 2:06-cr-00013-JRG   Document 23   Filed 08/08/06   Page 5 of 9   PageID #: 5

may legally search for weapons if a reasonably prudent officer in the same circumstances would be justified in believing that his safety or that of others was threatened." *United States v. Williams*, 962 F.2d 1218, 1223 (6th Cir. 1992). The "something" defendant placed between the car seats when she was initially stopped turned out to be nothing more than cigarette lighters. Nevertheless, her actions were furtive and, bearing in mind the innocuous nature of those cigarette lighters, peculiar. A drug dog had alerted on the car, and Ms. Ayers had been under investigation for some time as a narcotics trafficker. A pat down search of defendant's person as the investigation progressed was not only proper, a failure to do so would have been irresponsible.

All the officers at the scene were male and, because of plaintiff's gender, they preferred not to conduct the pat down search themselves if any alternative was available. That alternative of course was a female officer, and they used the radio to call any nearby female police officer to come to the scene, if possible. Patrol Officer Burkey heard that radio transmission and she responded to it, arriving approximately fifteen minutes later. As she conducted a search of defendant's person, she felt a long, thin cylindrical tube beneath defendant's pants in the vicinity of the "underwear line." From training and experience, Officer Burkey immediately recognized the tube for what it was, a crack pipe. She continued with her pat down search and found yet another crack pipe in defendant's pants pocket. Defendant was thereupon placed under arrest for possession of drug paraphernalia.

During his search of defendant's vehicle, Agent Dean had noticed an infant safety seat, prompting him to ask defendant if she had any children who should be tended to in view

6

of her arrest. Defendant told Agent Dean that she had several children at her home, the youngest in diapers, and the oldest who was age fifteen. Agent Dean then called the Department of Childrens' Services. Recalling that it was in the early morning hours by this time, 3:00 a.m. or so, the DCS worker requested that Agent Dean himself go to the house to investigate the safety of the children and to arrange for the protective custody of those children.

When Agent Dean arrived at defendant's residence, the door was opened by the fifteen-year old daughter. Agent Dean told her why he was there and asked if he could come in to check on the children, and the young girl allowed him to enter.[5] As he entered, he observed in plain sight on a computer desk to the right of the front door, another crack pipe. He and the other officers walked through the house to gather up all the children, bringing them into the front or living room. Defendant's mother in the meantime had arrived and she took custody of the children. Other than the crack pipe on the computer table, nothing else was seized or observed in the house. The officer's entry into the house at the instructions of the Department of Childrens' Services to tend to the children was appropriate; it was not a subterfuge to conduct a search, and in fact no search occurred. The officer observed a crack pipe in plain view on a table and it was legitimately seized.

In the meantime, a booking officer at the Washington County Jail called Agent Dean and told him that a search of defendant's person at the jail revealed a bag containing a

---

[5]Presumably he would have entered if she had refused, as he certainly should have under the circumstances.

crystalline substance. Agent Dean went to the jail and talked to her about (1) the possibility of getting a consent to search her home, and (2) talk with defendant regarding what the booking officer had found on her person. Defendant ultimately executed a written consent to search her home (Exhibit 1). Defendant states in her motion that this written consent in fact was involuntary and she executed it only because Agent Dean threatened to take her children away if she refused. Agent Dean denied making any such threat, and he is believed. He did testify, however, that he told defendant that if she did not execute the consent, he already had probable cause to get a warrant. This "threat" was not at all improper; Agent Dean in fact did have probable cause to get a warrant to search defendant's dwelling and his threat, if it should be characterized as such, was not an empty one. *See, U.S. v. Salvo*, 133 F.3d 943, 954 (6th Cir., *cert.* denied, 523 U.S. 1122 (1998). The defendant's execution of a consent to search her house was knowledgeable and voluntary.

There was no violation of defendant's rights under the Fourth Amendment at any time. It is respectfully recommended that defendant's motion to suppress be DENIED.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party

expects the transcript to be filed, or (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

RESPECTFULLY SUBMITTED,

  s/Dennis H. Inman
Dennis H. Inman
United States Magistrate Judge